**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ANNETTE RAMOS ERKAN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| ) | |
| vs. ) | Case No. 04 C 1550 |
| ) | |
| ILLINOIS DEPT. OF CORRECTIONS, ) | |
| GEORGE A.P. MURPHY, ILLINOIS STATE ) | |
| POLICE, BRIDGET BERTRAND, DALE ) | |
| SAYSET, and JAMES POORTINGA, ) | |
| ) | |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER[1]

MATTHEW F. KENNELLY, District Judge:

Annette Ramos Erkan began working as a corrections officer at the Joliet Correctional Center in 1998. She has sued her employer, the Illinois Department of Corrections ("IDOC"), for gender and national origin discrimination, hostile work environment, constructive discharge and retaliation under Title VII of the Civil Rights Act of 1964. Erkan has also sued the Illinois State Police and four current and former employees for retaliation under 42 U.S.C. § 1983. The defendants have moved for summary judgment. For the following reasons, the Court grants the motion.

### Facts

Because defendants have moved for summary judgment, the Court views the facts in the light most favorable to the plaintiff and draws reasonable inferences in her favor. *See DeValk*

---

[1] The Court thanks appointed counsel Douglas Brown for his diligent service on behalf of the plaintiff.

*Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326, 329 (7th Cir. 1987).

On November 9, 1998, Erkan, who is a Mexican-American woman, began working as a corrections officer at the Joliet Correctional Facility. She went on medical leave on February 25, 2002 due to injuries she sustained in a car accident. Erkan alleges that she suffered discrimination and a hostile work environment based on her national origin and gender while actively employed at Joliet. She acknowledges that no IDOC employee ever referred to her national origin or gender in a derogatory manner in her presence. She claims, however, that she encountered discrimination, a hostile work environment, and retaliation based on incidents that occurred over a period of several years.

Erkan claims that in April 1999 one of her superiors, Captain Gregory Rucker, asked her out for drinks. Erkan testified that she declined Rucker's invitation, and Rucker never mentioned anything about going out again. Rucker denies that he ever asked Erkan out or did anything improper.

Erkan claims that in December 1999, a fellow guard, Officer Taylor, asked her to falsely accuse another guard, Captain Harris, of certain conduct to bolster a potential complaint Taylor allegedly planned to file against IDOC for refusing her medical treatment. Taylor is African-American; Harris is Caucasian. Erkan believes that because she refused to help Taylor, certain of Erkan's co-workers retaliated against her. Erkan does not identify any evidence that any conversation between her and Taylor involved the race, national origin or gender of Erkan, Taylor, or Harris. She does claim, however, that another corrections officer, Officer Carson, told her "You want to know what's going on? Everyone knows how you refused to back another officer. You should have backed her up. We should always back each other up that's the way

things are done around here." Erkan does not contend that Carson referenced her national origin or gender during this conversation.

Though Erkan never heard disparaging comments about her national origin or gender at the prison, Officer Joe Ramos (Erkan's brother) testified that he heard such remarks at a union meeting that took place at a bar apparently owned by Rucker. Ramos testified that several African-American officers questioned him about why Erkan would not back up Taylor in her claim against Harris. Ramos testified that these officers called Erkan an "Uncle Tom" at the union meeting. Ramos further testified that, while working at the prison, other officers made disparaging remarks about his Mexican origin. He claims that he was called "wetback," "spic," and "Uncle Tom" among other things. Ramos did not identify which co-workers made these statements or when they were made.

Erkan claims that she suffered several adverse employment actions because she is a Mexican-American woman. The IDOC would occasionally assign officers to "temporary sergeant" assignments when needed. In October and November 2001, a captain assigned officers with less seniority than Erkan to serve as temporary sergeants at the prison hospital. Erkan claims that she had equal or better qualifications than those officers assigned the temporary sergeant position. Her supervisor, however, testified that Erkan was not qualified to fill the role of temporary sergeant because she had issues "relating to others, having good communication skills, being able to motivate staff [and] enforce rules [and] policy." Def. Ex. J at 41. In accordance with her union contract, Erkan received sergeant's pay for each instance that someone with greater seniority assumed the role of temporary sergeant.

Erkan also claims that she suffered disciplinary action as a result of discrimination and

retaliation. A corrections officer is required to turn in "zone reports" about the condition of the unit to which she is assigned within thirty minutes of coming on duty. Erkan received five or six disciplinary referrals from Rucker for not turning in zone reports during 2001. Erkan testified that she "felt" the disciplinary reports were prompted by discrimination and retaliation because "she did not know of this happening to other officers but she was the only Mexican woman." Def. Ex. C at 86. The referrals did not result in any disciplinary action against Erkan. She also was subjected to several performance audits which, she claims, were a result of discrimination. These audits did not result in any disciplinary action.

Erkan also claims that she was reprimanded for "unauthorized absences" on April 1, 2001, May 21, 2001, and May 29, 2001 and attributes these reprimands to unlawful discrimination. Erkan's April 1, 2001 attendance record (known as a "call-off slip") was later found, Erkan was paid for the day, and the reprimand was expunged. The May 21 and May 29 call-off slips could not be located, so a supervisor prepared new ones. However, because the new call-off slips were late, Erkan had to use her "benefit time" (presumably, time off included in her compensation package) for the two absences. Erkan believes that the reprimands were given in retaliation for her December 1999 refusal to support Taylor's claim that she had been denied medical attention and her April 1999 refusal to go for cocktails with Rucker.

Erkan was reprimanded for reading unauthorized material on duty in October 2001, a charge that she denied. Erkan testified that she believes she received the reprimand because she was the only female of Mexican origin working at the prison.

IDOC required Erkan and other corrections officers to attend annual training classes known as "cycle training." Cycle training included instruction and certification in areas such as

weapons, CPR, first aid, counting procedures, vehicles, keys, and harassment and discrimination policies. Erkan contends that she received a disciplinary notice for failing to attend cycle training, though she did not lose any pay or other benefits. Erkan stated that she asked to be excused from cycle training to attend to her son, who was ill, but that IDOC refused her request. She does not know of any other employee who was scheduled for cycle training who failed to attend.

Erkan claims that she was assigned to "writs detail" after having asked to be excused. Officers on writs detail transport prisoners to locations outside the prison for matters such as court appearances or medical appointments. Erkan asked to be excused because her son had a medical condition, and she did not want to be away from home. IDOC did not excuse her from writs detail. She claims that this is evidence of discrimination.

Erkan claims that she was put in physical danger as a result of the alleged discrimination. She claims that in March 2001 a supervisor assigned her to guard, by herself, 320 prisoners in the top two tiers of a particular cell house. The sergeant on duty, Sgt. Meyer, ordered Erkan to bring the prisoners down from the cell house by herself. Erkan claims that many of the prisoners in her charge were violent offenders and made her feel that "she was in great danger." Def. Ex. C at 305-08. Erkan also identifies a similar incident in May 2001 when she was required to move 150 inmates by herself. She claims that she asked for the keys to place the inmates in their cells but that Sgt. Meyer denied her request. Accordingly, she had to move the inmates into twenty cells by herself. Meyer testified that he radioed Erkan to say that he had the keys but was not in the unit to give them to her. Erkan claims that another officer asked for the keys later that day and received them. Erkan believes that Meyer refused to give her the keys because she is a

5

Mexican woman. She further alleges that at various times other officers refused her requests for assistance and undermined her authority in front of inmates. For example, she claims that one time the inmates under her charge were not allowed to shower but that inmates under the supervision of all the other guards, each of whom was African-American, were permitted to shower.

In January 2002, Erkan submitted a written complaint to the Illinois Department of Labor ("IDOL") regarding what she believed to be safety violations at one of the Joliet watchtowers. Other than two corrections officers per day, no one else used the tower, and no member of the general public or prisoners were permitted in that part of the prison. The IDOL investigated and cited the IDOC for having loose blocks in one section of a tower passageway.

During a roll call on February 12, 2002, Erkan was talking to the officer standing next to her. According to Erkan, the roll call supervisor, Assistant Warden Welch, "grabbed [her] by [her] arm" and "flung" her across the room. Erkan believes that Welch's actions were in retaliation for Erkan's complaints to the IDOL. Welch has stated in an affidavit that she did not recall being aware of Erkan's IDOL complaint at the time of the roll call incident.

After the roll call incident, Erkan filed a complaint with the Illinois State Police alleging that Welch had committed a battery. Erkan later met with defendants Bridget Bertrand and James Poortinga of the Illinois State Police to discuss the incident. Erkan claims that Bertrand and Poortinga told her that their supervisors, defendants Dale Sayset and George Murphy, wanted them to terminate the investigation. Erkan claims that Bertrand and Poortinga threatened her with incarceration if she did not recant her allegations against Welch. She says that they made the threats as retaliation for Erkan's complaint to the IDOL in an effort to assist a

"complementary state agency, the Department of Corrections." Resp. to Mot. for Summary Judg. at II(G). Erkan ultimately signed a document recanting her allegations. She received a three-day suspension from IDOC for filing a false report.

Erkan's fourth amended complaint includes four claims. In Count 1, Erkan alleges that because of discriminatory treatment by supervisors and co-workers based on her national origin and gender, she was "forced to cease working" at IDOC – in other words, she was constructively discharged. Fourth Am. Compl. ¶ 42. In Count 2, Erkan alleges that she was subjected to a hostile work environment based on her national origin and gender. In Count 3, Erkan alleges that she was retaliated against for complaining about discriminatory treatment. In Count 4, Erkan alleges that she was retaliated against for exercising her First Amendment rights.

## Discussion

When a district court rules on a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Entry of summary judgment is appropriate only when the pleadings, depositions, answers to interrogatories, admissions, and affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c).

### A.   Exhaustion of Administrative Remedies - Counts 1 and 3

Defendants argue that the Court should enter summary judgment on Erkan's Title VII retaliation and constructive discharge claims (Counts 1 and 3) because she failed to exhaust her administrative remedies with respect to those claims. Before filing a lawsuit under Title VII, the employee must "afford the EEOC and the employer an opportunity to settle the dispute through

7

conference, conciliation, and persuasion." *Cheek v. Western & Southern Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994). "However, because EEOC complaints are most often compiled without assistance of counsel, we afford plaintiffs considerable leeway and ask only whether a claim set forth in the complaint is 'like or reasonably related to the allegations of the charge and growing out of such allegations.'" *Hottenroth v. Village of Slinger*, 388 F.3d 1015, 1035 (7th Cir. 2004) (quoting *Cheek*, 31 F.3d at 500).

Erkan's Title VII retaliation claim is unrelated to the allegations she made in her EEOC complaint and does not grow out of those allegations. In Erkan's April 2002 EEOC complaint, she claimed that she suffered discrimination as a result of her national origin and gender. Were Erkan claiming that she was retaliated against for making that complaint, her failure to file a second EEOC charge alleging retaliation would not bar her claim. *Aviles v. Cornell Forge Co.*, 183 F.3d 598, 603 (7th Cir. 1999). Erkan's retaliation claim, however, is unrelated to filing her charge with the EEOC. Rather, the basis of the claim concerns Erkan's alleged refusal in December 1999 to assist her co-worker, Officer Taylor, with a complaint Taylor purportedly planned to file against a supervisor, Captain Harris. Resp. to Mot. for Summary Judg. at II(C). Even construing the facts in the light most favorable to Erkan, any retaliation she suffered from the December 1999 incident with Taylor is unrelated to the allegations in her EEOC charge. Erkan attempts to characterize the incident as her "opposition to an unlawful discriminatory practice: her refusal to participate in a discriminatory scheme designed by an African-American female prison guard [Taylor] against a white male captain [Harris]." *Id.* This contention, however, is unsupported by any evidence, and, in any event, it is unrelated to Erkan's claims of discrimination based on her own protected status. Accordingly, defendants are entitled to

8

summary judgment on Erkan's Title VII retaliation claim (Count 3) for failure to exhaust administrative remedies.[2]

Defendants also contend that Erkan did not administratively exhaust her constructive discharge claim (Count 1). In February 2002, Erkan suffered injuries in a traffic accident and went on leave from her job. She claims that as a result of what she characterizes as discrimination, harassment, and retaliation, she could not return to work after she recovered from her injuries. Resp. to Mot. for Summary Judg. at II(E). Later, Erkan says, she asked IDOC for an accommodation that would permit her to return to work, hoping that this would result in a transfer to a different job assignment away from the persons she claims caused the discrimination, harassment, and retaliation. *Id.* The hoped-for transfer never took place, and Erkan never returned to work. Erkan claims that she was constructively discharged.

Constructive discharge "refers to a situation in which an employee is not fired but quits." *Jordan v. City of Gary*, 396 F.3d 825, 837 (7th Cir. 2005). Erkan did not mention constructive discharge in her April 2002 EEOC complaint. But as best as the Court can determine, her constructive discharge claim arises from the same underlying conduct that Erkan asserted in her

---

[2] Even were the Court to find that Erkan had exhausted her administrative remedies with regard to her Title VII retaliation claim, the Court would still grant defendants summary judgment on this claim. Erkan's refusal to support Taylor in her complaint against Harris is not a "protected activity" within the meaning of Title VII because Erkan was not opposing or complaining about discrimination prohibited by Title VII. *See Campbell v. Dominick's Finer Foods*, 85 F. Supp. 2d 866, 874 (N.D. Ill. 2000) (activity was not protected where plaintiff was "not 'opposing' an action taken by his employer, nor participating in a Title VII investigation, proceeding or hearing.") Indeed, Erkan does not point to any facts from which a reasonable jury could conclude that the race of either Taylor or Harris, or Erkan's own protected status, had any relevance to Taylor's purported complaint against Harris. Erkan's own speculation regarding Taylor's alleged "discriminatory scheme" is insufficient to defeat summary judgment. *McCoy v. Harrison*, 341 F.3d 600, 604 (7th Cir. 2003).

EEOC charge. Under the circumstances, the Court cannot say that this particular claim is not reasonably related to the allegations in that charge. Defendants are not entitled to summary judgment on the constructive discharge claim on this basis.

**B.     Title VII Hostile Work Environment – Count 2**

In Count 2 of her fourth amended complaint, Erkan alleges that she was subjected to a hostile work environment based on her national origin and gender. Title VII protects against hostile work environments that exist because "the victim was singled out because of his or her gender [or national origin]." *Patton v. Indianapolis Public School Board*, 276 F.3d 334 (7th Cir. 2002).

To support her claim that she suffered a hostile work environment, Erkan points to the fact that she had to guard a large number of inmates by herself, supervisors undermined her authority in front of inmates, she was assaulted by Assistant Warden Welch, she was asked out by Rucker, and her brother overheard ethnically and sexually offensive comments at a union meeting.

A work environment is hostile "when discriminatory intimidation, ridicule and insult . . . is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment . . . ." *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 78 (1998). To determine whether a work environment is hostile, courts in this circuit examine the frequency of discriminatory conduct, its severity, whether the discriminatory conduct is "physically threatening or humiliating" or merely offensive, and whether the conduct "unreasonably interferes with [the plaintiff's] work performance." *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 463 (7th Cir. 2002).

By itself, the alleged assault by Assistant Warden Welch is insufficient to support a hostile work environment claim. *See Burnett v. Tyco Corp.*, 203 F.3d 980, 9845 (6th Cir. 2000) (single battery coupled with two offensive remarks over six-month period does not create an issue of material fact regarding existence of hostile work environment). In any event, Erkan points to no evidence that this incident had any relationship to her gender or national origin. Thus it does not qualify as conduct that, together with other discriminatory treatment, might give rise to a viable hostile work environment claim.

Erkan's contention that Rucker, her supervisor, asked her out likewise is insufficient to sustain a hostile work environment claim. *See Whittaker v. Northern Illinois Univ.*, 424 F.3d 640, 646 (7th Cir. 2005) (supervisor's comments to plaintiff that she should join him for a weekend on his boat for "drinking and other things" did not constitute a hostile work environment). "Isolated instances of nonsevere misconduct will not support a claim of a hostile environment." *Saxton v. AT&T Co.*, 10 F.3d 526, 533 (7th Cir. 1993).

She does not point to a single offensive or derogatory comment made in her presence concerning her national origin or gender. The alleged bigoted comments overheard by Erkan's brother, outside her presence, are not sufficient to allow a jury to find that Erkan was subjected to a hostile work environment. *See Ngeunjuntr v. Metropolitan Life Ins. Co.*, 146 F.3d 464, 467 (7th Cir. 1998); *Johnson v. City of Fort Wayne*, 91 F.3d 922, 938 n. 8 (7th Cir. 1996).

The remaining matters Erkan cites in support of her hostile work environment claim involve allegedly discriminatory work assignments. She complains about having to guard large numbers of dangerous inmates, having superiors question her judgment and authority, being disciplined for talking during roll call and reading non-work related materials on duty, and being

11

assigned duties such as writs detail that she did not like. The social context of Erkan's workplace – a maximum security prison – must be taken into account when determining whether her work environment is actionably hostile. *See Hilt-Dyson*, 282 F.3d at 463. In *Hilt-Dyson*, a police officer claimed that she was subjected to a hostile work environment. The court distinguished the atmosphere in a police department from other workplaces, saying "[d]iscipline in police departments is quasi-military in nature and sworn officers expect to participate in inspections, drills and other activities that create superior-subordinate encounters not found in civilian occupations. Many of these encounters . . . are often unpleasant, and, in the eyes of the subordinate, demeaning." *Id.* at 464. The same analysis applies to this case. The matters about which Erkan complains are inherent in the responsibilities of a corrections officer at a maximum security prison. They do not give rise to a claim of a hostile work environment violative of Title VII.

For these reasons, no reasonable jury could find that Erkan has established the existence of an objectively hostile work environment, an element that Erkan must prove to succeed. The defendants are entitled to summary judgment on Count 2.

## C.     National Origin and Gender Discrimination – Count 1

In Count 1 of her fourth amended complaint, Erkan asserts a claim of national origin and gender discrimination under Title VII. Erkan has described this as a constructive discharge claim. No reasonable jury could find in her favor on a claim of constructive discharge. As the Seventh Circuit has stated, to support a constructive discharge claim, the plaintiff's working conditions "must be even more egregious than the high standard for hostile work environment because in the ordinary case, an employee is expected to remain employed while seeking

redress." *Tutman v. WBBM-TV, Inc. / CBS, Inc.,* 209 F.3d 1044, 1050 (7th Cir. 2000). The Court's conclusion that Erkan cannot establish the basis for a hostile work environment claim thus necessary requires a conclusion that the defendants are entitled to summary judgment on her constructive discharge claim.

Even were the Court to consider Count 1as a standard claim of discriminatory treatment, Erkan cannot survive summary judgment. There is certainly evidence that co-workers, including some of the persons who allegedly subjected Erkan to mistreatment and/or undesirable work assignments, made bigoted comments at a union meeting and, perhaps, on other occasions. To the extent these comments were made by supervisory personnel responsible for the allegedly discriminatory treatment of Erkan, they conceivably might amount to evidence that would allow Erkan to proceed on a disparate treatment claim using the so-called "direct method" of proof. *See, e.g., Troupe v. May Dept. Stores*, 20 F.3d 734, 736 (7th Cir. 1994) (referring to "ambiguous statements oral or written [and] behavior toward or comments directed at other employees in the protected group" as the type of evidence that might permit a disparate treatment claim to proceed); *Sylvester v. SOS Children's Villages*, 453 F.3d 900, 905 (7th Cir. 2006) (reaffirming *Troupe*). But even if that were the case, Erkan has failed to offer evidence from which a reasonable jury could find that she suffered an adverse employment action, a requirement for recovery under Title VII. *See, e.g., Herrnreiter v. Chi. Housing Auth.,* 315 F.3d 742, 743-44 (7th Cir. 2002). Adverse employment actions are typically economic injuries. *Markel v. Board of Regents of Univ. of Wis. Sys.*, 276 F.3d 906, 911 (7th Cir. 2002). Though loss of non-monetary benefits can constitute adverse actions, "[t]he adverse action must materially alter the terms and conditions of employment." *Sutler v. Ill. Dept. of Corrections*, 263 F.3d 698, 703 (7th

Cir. 2001).

In this case, Erkan has not identified any alleged injuries that qualify as adverse employment actions by materially altering the terms and conditions of her employment – aside from her claim of constructive discharge, which the Court has already determined to be insufficient. The reprimands and audits of which Erkan complains are not adverse actions. *See Oest v. Ill. Dep't of Corrections*, 240 F.3d 605, 613 (7th Cir. 2001) ("Absent some tangible job consequences accompanying the reprimands, we decline to broaden the definition of adverse employment action to include them."). Erkan's complaints about prison working conditions, such as having to supervise large groups of inmates and not receiving backup assistance, likewise do not constitute adverse actions. *Washington v. Ill. Dep't of Revenue*, 420 F.3d 658, 660-61 (7th Cir. 2005) ("only severe or pervasive change[s] in the daily 'conditions' of employment may be treated as discriminatory."). Erkan's non-selection for temporary sergeant likewise does not constitute an actionable adverse action. In this regard, we are dealing not with an actual promotion to the position of sergeant, but rather with a temporary assumption of a sergeant's responsibilities because an officer holding that rank was not available. Moreover, because of her union contract, Erkan received sergeant's pay even though she was not selected. Under the circumstances, the non-selection does not constitute an adverse action. *Hottenroth v. Village of Slinger*, 388 F.3d at 1029 (adverse employment action does not include an employer's refusal to grant employee a discretionary benefit to which the worker is not entitled).

Because Erkan has not suffered any actionable adverse employment action, the IDOC, the only defendant named in Count 1, is entitled to summary judgment on that claim.

**D.     Section 1983 Retaliation – Count 4**

Erkan has made a claim of retaliation under 42 U.S.C. § 1983 against four current and former employees of the Illinois State Police, alleging that they retaliated against her for exercising her constitutionally protected right of free speech.  To prevail on a section 1983 claim, a plaintiff must establish that the defendants, acting under color of state law, deprived her of a constitutional or federal right.  *Brokaw v. Mercer County*, 235 F.3d 1000, 1009 (7th Cir. 2000).  To prevail on a claim of retaliation for exercising First Amendment free speech rights, a plaintiff must demonstrate that her speech was constitutionally protected and that the protected speech motivated the defendants' actions.  *Vukadinovich v. Bd. of School Trustees of North Newton*, 278 F.3d 693, 699 (7th Cir. 2002).

Erkan claims that the Illinois State Police defendants retaliated against her for her complaint to the IDOL regarding the safety violations at Joliet.  She contends that the retaliation consisted of the officers "coercing" her into recanting her charge of battery against Assistant Warden Welch.  Erkan's section 1983 claim fails, however, because she cannot satisfy the threshold requirement that her complaint to the IDOL was protected speech under the First Amendment.  A statement is protected under the First Amendment if it is "fairly characterized as constituting speech on a matter of public concern." *Connick v. Myers*, 461 U.S. 138, 146 (1983). A matter of public concern "relat[es] to any matter of political, social or other concern to the community."  *Id.* at 146.  By contrast, "when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of a personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior."  *Id.* at 147.

Erkan's complaint to the IDOL concerned what she believed to be dangerous working conditions in one of the watchtowers at the prison. The watchtower was not open to the inmates or to members of the public. Rather, the tower was utilized by two corrections officers each day. In short, Erkan's complaint to the IDOL concerned her belief that part of her worksite had physical conditions that were unsafe to her and other workers. Under the circumstances, no reasonable jury could find that her complaint involved a "matter of political, social, or other concern to the community." *Connick*, 461 U.S. at 146. Accordingly, defendants are entitled to summary judgment on Count 4.

## Conclusion

For the reasons stated above, the Court grants defendants' motion for summary judgment [docket no. 68]. The Clerk is directed to enter judgment in favor of the defendants. The trial date of January 8, 2007 is vacated.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: October 27, 2006